STAPIvRS, J.
Although the bond in controversy is in the possession of a bona fide purchaser, the obligor may, notwithstanding, make any defence here he could have made in an action by the obligee. The purchaser holds the bond subject to every infirmity of consideration — to all the equities attaching to the instrument in the hands of the party to whom it was executed. The only question then to be considered is, what did the parties mean bv the words ‘‘current funds,” used in the several obligations executed by the vendee? Did they intend to provide for payment of the debt in the money current, whatever it might be, *1017 at the maturity of these obligations, or were they contracting with reference to Confederate money, and its probable continuance as the circulating medium of the country. This question must be decided not alone by the language of the instrument, 'but by a careful consideration of all the facts and circumstances.
That an individual during the war, having urgent need for Confederate notes, and knowing they would be useful to him in the payment of specie debts, might have been willing to execute his obligations therefor, payable at a remote period, and incur all the risks of an appreciation of the currency may be readily imagined. But it is difficult to believe that a person possessed of ordinary intelligence would deliberately have encountered the hazard of being required to pay $25,000, with its accumulated interests, in a sound currency, for a tract of land worth only $6,000, whatever may have been his conviction of the result of the struggle. Certainly if the parties looked forward to some other and more valuable currency as a medium of payment, and measured their agreement by a more permanent standard, that very consideration must have had its influence on them in estimating the price to be paid for the property.
If we are permitted to speculate as to their views, we may reasonably suppose they entertained the opinions held by a great majority of the people. They probably anticipated an early triumph of the Confederate cause, and, as a necessary result, a marked appreciation of the Confederate money. Mr. Wellington Goddin, a witness, an extensive auctioneer and real estate agent during the war, in answer to a question asked him, says that he wrote the bonds in accordance with instructions given him by the parties; that he does not know what were their views as to the kind of currency in which the bonds were to be paid; but that he would state his opinion after hearing an interview between them at the time. He says : ‘ ‘ Confederate notes at the time of the contract were greatly depreciated, and as nearly all the citizens of the South had the greatest confidence in the success of the cause, and as in that event the currency would be greatly enhanced in value, persons selling real estate *were willing to sell on credit, in the hope that by the maturity of the obligation, the success of the Confederacy would be established.” If the parties consummated their sale and purchase with these views and expectations, they contracted on the basis of Confederate money as the medium of payment. A contract of this sort is substantially the same as a contract to pay in Confederate States notes. It is a contract, according to the real understanding of the parties, entered into with reference to such notes as the standard of value, and to be fulfilled in like medium.
The extended credit given would indicate, in such a case, not that the vendor expected pajunent in coin or lawful money of the United States, but that the Confederate currency would be less depreciated when the day of payment arrived. In this view the stipulation in relation to “current funds” may be readily explained as intended to exclude the idea of an agreement to pay in coin. These views are strongly confirmed by the conduct of the vendor subsequent to the sale. In October 1863, we find him receiving from the vendee payment in full of the bond maturing in June 1868. The bond falling due in June 1867, was placed by him in the hands of a broker and sold for Confederate money. The remaining three were assigned to Uendall Griffin, from whom he had purchased the land. It is not proved; it in not even suggested, that the vendor was impelled to this course by a pressing and urgent demand, or by the prospect or hope of a better investment. His sale of the bonds under the circumstances is utterly inconsistent with the theory that the vendor was unwilling to receive the Confederate notes, and intended to await the advent of a better circulating medium. The conduct of the holders of these bonds also repudiates such a pretension. As late as November 1864, all of them, except the appellant, readily accepted payment, not because their necessities required it, but, according to the evidence, because *they were apprised of the real agreement and ‘understanding of the original parties. This understanding has been fully proved by the vendee, whose deposition has been taken and read without objection. According to his statement it was expressly agreed between him and the vendor he should have the privilege of discharging the whole amount of the purchase money at any time before its maturity, and in accordance with this privilege he had paid all the bonds except the one in controversy, which he also proposed to pay in January 1865. It is also proved by another witness, S. N. Davis, “that in a conversation held in 1863 with the vendor about the sale of the property, that the latter said he had made a sale to Salmon, the vendee, on long time, giving him the privilege to pay for the place whenever he got the money, which he was satisfied he would soon do. ’ ’ These statements are strongly corroborated by the conduct of the vendor before alluded to, and are not contradicted by any evidence in the record. If they are to be believed, it seems to me they are decisive of this case. They explain the motives and views of the parties in entering into the contract — that no special importance or meaning was attached by either to the use of the words “current funds,” orto the extended credit given; that the vendor certainly did not intend thereby to provide for payment in some better currency, nor the vendee to subject himself to the hazard of being forced to pay four times the value of the property purchased, without the slightest probability of being a gainer by the arrangement.
It is insisted, however, that this evidence is plainly contradictory of the written agreement. Were this so, it would *1018 still be legitimate, as the statute authorizes either party to show by parol or other relevant evidence, what was the true understanding, either expressed or tobe implied, in respect to the kind of currency in which the contract was to be fulfilled. Such evidence, however, *does not modify or alter the written agreement. As was said in Thorington v. Smith, 8 Wall. U. S. R. 1, it simply explains an ambiguity which under the general rules of evidence may be removed by parol. It enables the court simply to interpret the written terms according to the real intent and agreement of the parties, and to understand what was meant by the words they have employed.
The case of Taylor v. Turley, 33 Maryland R. 500, very recently decided, in some of its features is very similar to this. The note in controversy there was executed the 7th February 1863, in the State of Tennessee, while the Confederate forces “were in the ascendancy in that State, for a loan of Confederate money, payable two years after date, “in current bankable funds.” Four judges in a court of seven, held that the note was payable in United States currency. The other three were of opinion that the note according to its terms, when construed in the light of the facts and circumstances described by the evidence, was payable in Confederate currency. Judge Stewart, in delivering the opinion of the majority, relies mainly upon the fact, that no evidence had been adduced tending to show that the parties in employing the -words, “current bankable funds,” referred to Confederate money, and its probable continuance for the next two years as the prevailing currency of the State of Tennessee. On the contrary, the facts showed that they contracted in view of the fluctuating value of the circulating medium in that State, depending upon the fortunes of war, at one time Confederate notes constituting the currency, and at another United States treasury notes, accordingly as the contending forces alternately obtained the ascendancy; and these very fluctuations confirmed the conclusion that the parties contemplated the very possible occurrence of a different currency at the maturity of the obligation from *the one then prevailing, and adopted the terms of the note to meet such a contingency.
In the State of Virginia the condition of things was entirely different. At the period of the execution of this instrument, certainly, there was no such struggle for ascendancy between contending forces, no such fluctuations and changes of currency, as in the State' of Tennessee. The operations of the government and the transactions of the people were almost universally conducted through the medium of the Confederate treasury notes. It seems to me, therefore, the construction given to a Virginia contract of 1863 should be the very reverse of that applied to a Tennessee contract of the same period. It is certainly reversing the order of things to presume that parties, contracting with reference to the prevailing currency, contemplated payment in some other unknown and more valuable medium. No such presumption results necessarily from the use of the words, “current funds.” There is no magic in these words. No legal import* attached to them. Their proper interpretation depends upon the time when and the circumstances under which they are used. The Supreme court of the United States, without the aid of legislative enactments, finds no difficulty in divesting the word dollar of its long established legal signification in this class of cases, and of considering it in the light of all the circumstances surrounding the parties. We on the other hand, with the aid of a liberal statute, are continually embarrassed in our efforts properly to interpret the words ‘ ‘ current funds, ’ ’ and phrases of a like character, when employed in the same connection. Most persons are willing to concede that an obligation executed in 1863 or 1864 for the payment of dollars, although at a remote period, is to be considered a Confederate contract when founded on a loan of Confederate notes, or a sale of property at Confederate prices. In such case they agreed that the parties meant the dollars in circulation *when the contract is made, and not when it matures. But if the words “current funds” and the like are inserted, something else was intended of a wholly different character. In that case it is a contract of hazard; a speculation upon the currency and the duration of the war was intended; and upon this arbitrary rule of interpretation, the unfortunate purchaser or borrower is overwhelmed with a debt never seriously contemplated by either of the parties. It seems to me, the most just and reasonable interpretation is, to consider these words as simply intended in such cases to guard against any contingency of an obligation to pay in coin.
The case of Boulware v. Newton, 18 Gratt. 708, has been cited as sustaining the pretension of the appellant. There the obligation was for the payment of the sum designated “in current funds.” The counsel in that case, relying upon the authority of certain English cases, insisted that the parties were precluded by the reason, policy, and intendment of the law, from affixing to the words “current funds” any other meaning than that of funds current at the date of the contract. Judge Rives, in answering this view, said this would be to disregard the true reason of the authorities, and to deny to our citizens, at that time under all the circumstances of their condition,that absolute freedom of contracting in view of all possible eventualities, which the principles of the common law secure to all, in spite of the changes of government. It was held, not that the words in question of themselves excluded the supposition that Confederate currency was intended, but in the connection in which they were used, and under all the circumstances and provisions of the contract, they would not admit of that interpretation. It was said by Judge *1019 Anderson, in Miller & Franklin v. City of Lynchburg, 20 Graft. 330, 343, that he was indisposed to extend the principle of Boul-ware v. Newton, in its application to other cases, and would not apply it unless required to do *so by clear and conclusive evidence; and in this remark all the judges concurred.
It is supposed that Kraker v. Shields, 20 Graft. 377, is an authority for the appellant here. The cases will be found on examination to be wholly dissimilar. In Kraker v. Shields nothing is said in the notes or deeds of trust about the currency in which payment was to be made, but the money is described generally as so many dollars. There the laud was sold in November 1862, at the price of fourteen thousand and five hundred dollars, of which 55,000 were paid in cash in Confederate notes. The estimated value of the land in coin before the war and at the date of sale, was ten thousand dollars, and in November 1865 it would have sold for fifteen thousand dollars. Estimating the cash payment at its specie value, and supposing the remainder payable in United States currency, the price stipulated to be paid was about the fair value of the property. In point of fact, however, two instalments falling due in 1863 and 1864, were paid in Confederate money. It was proved that the vendor anticipating a better currency in a year or two, expressly refused to sell except upon the terms of receiving the deferred instalments in the money in circulation when the bonds matured, and that these terms were communicated to the purchaser and by him accepted, though with considerable reluctance and hesitation.
In the present case the real value of the land does not exceed six thousand dollars, while the agreed value was thirty thousand dollars. Does any one suppose that the purchaser would have entered into this contract, if the vendor here, as in Kraker v. Shields, had informed him it was his determination not to receive payment until the maturity of the respective bonds, and then to require it in gold if that should be the circulating medium. So far from it, the proof is, as I have before stated, that the vendee made the purchase and executed his bonds in the form adopted, with the express reservation of a right to *pay them at his pleasure in Confederate currency. And in accordance with this privilege, he did pay all of them except the one in controversy, and not only asserted his right to pay that, but made a formal tender of the amount. If the vendor, instead of selling these bonds, had retained possession of them, refusing payment when tendered, and was now asserting a claim to a recovery of twenty thousand dollars, with interest thereon from June 1863, in United States currency, such a claim would meet with little favor in a court of equity. It would be justly regarded as an attempted fraud through the forms of a written agreement. No one of course attributes any impropriety to the distinguished and excellent gentleman who purchased the bond in ignorance of the real contract of the parties; but according to well settled principles he can occupy no higher ground than his assignor.
As a general rule the construction of this class of contracts is matter of fact rather than law. In their interpretation, but little aid is to be derived from previous adjudications. Still I think we may study with profit and instruction the opinions of our predecessors in controversies arising at an early period of our history. After the close of the Revolutionary war a number of cases were before this court involving the adjustment of liabilities incurred during the existence of paper money. See Watson & Hartshorne v. Alexander, 1 Wash. 440; Skipwith v. Clinch, 2 Call, 213; Smith, ex’or, v. Walker, 1 Call, 39; Bogle, Somerville & Co. v. Vowles, 1 Call, 244; Commonwealth v. Beaumarchais, 3 Call, 122. In some of these cases the obligations were payable presently; in others at remote periods; in others the agreement was for the payment of a perpetual ground rent upon the conveyance of real estate in fee. Again, in others, leases had been made “for long terms in consideration of annual rents. In some instances the contract^ provided for the payment of so many pounds without further description. In others, the stipulation was to pay current *money or current funds of Virginia. In all these cases this court applied the scale of depreciation in some form, unless it appeared that a specie debt was intended.
It is true that these decisions were made under the act of 1781, which directed the application of a fixed scale to all the contracts and debts of that period, excepting debts and contracts made and entered into for gold and silver coin. But by the 5th section of the same act the court was authorized to award such judgment in such case as shall appear just and equitable. And in Ambler v. Wyld, 2 Wash. 54, the court said this section was not intended to let men loose from their contracts, but to allow a departure from the established scale in cases where it might be necessary to meet the real contract of the parties. It was the object then as now not to violate, but to execute the contract. And yet the court applied the scale to debts falling due after as before the close of the Revolutionary struggle, although in many instances the parties must have contemplated that the debts would be payable and the rents accrue long after the continental money had disappeared from the channels of circulation. This legislation and these decisions evince the strong disinclination of the distinguished men of that er^ to impose upon debtors the burden of discharging in a sound currency, the nominal amount of debts contracted in the depreciated currency of the Revolution. I think we may with safety immitate their example, applying to the contracts of our own time the same liberal rules of interpretation, and adjusting them upon the same humane and equitable *1020 principles whenever it can be done consistently in any degree with legal rights and obligations. These I am disposed to' respect in all cases; but where there is a doubt, any ambiguity in the terms of the contract, that doubt should be resolved in the interests of justice and equity, and according to the probable intent of the parties, rather than by the technical and rigid rules of the common law.
*Tn the present case there is nothing to prevent the application of these principles, nothing to preclude the court from declaring that this contract was entered into with reference to Confederate States treasury notes, and to be fulfilled in that medium according to the real understanding of the parties. As however these notes have ceased to circulate, the question arises as to the best mode of adjusting the rights of .the parties. The court is authorized under the statute to award a just compensation for the value of the property sold, if under all the circumstances of the case it thinks the fair value of the property will be the most just measure of recovery. This mode of adjustment in cases founded upon sales of property has received the sanction of this court in several cases not yet reported. In the present case it accomplishes the ends of justice to all the parties. The vendor having received the entire amount of the bonds, has of course no interest in the question. The assignee can have no substantial ground of complaint, as his purchase was made with Confederate funds, and he will now receive a sum largely in excess of the value of his investment. The vendee having paid five-sixths of the amount agreed by him to be paid, and being in arrear for the remaining-one-sixth, should in justice be required to pay its fair value. As however this court has not the materials before it for arriving at a correct conclusion upon this point, the cause should be remanded to the Circuit court, with directions to refer it to a commissioner to ascertain and report the fair value of the whole tract in United States currency at the date of the contract, and the vendee to be charged with one-sixth of such value, with interest thereon from the first day of June 1863.
The other judges concurred in the opinion of Staples, J.
Decree reversed.